IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT E. GUTTU, | ) | CASE NO.  1:19-CV-02593-BYP |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | MAGISTRATE JUDGE |
| SECURITY, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff Robert E. Guttu ("Plaintiff" or "Guttu") challenges the final decision of Defendant Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.  PROCEDURAL HISTORY

In November 2014, Guttu filed an application for POD and DIB.  (Transcript ("Tr.") 293.)  In February 2016, Guttu filed an application for SSI.  (*Id.*)  In both applications, Guttu alleged a disability onset date of March 31, 2011 and claimed he was disabled due to lower and upper back issues, carpal

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

tunnel in both hands, diabetes, Sherman's disease, and degenerative disc disease.  (*Id.* at 232, 249, 293.)  The applications were denied initially and upon reconsideration, and Guttu requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 269, 293.)

On May 26, 2016, an ALJ held a hearing, during which Guttu, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.* at 269.)  On October 5, 2016 the ALJ issued a written decision finding Guttu was not disabled.  (*Id.* at 293.)  On November 20, 2017, the Appeals Council vacated the ALJ's decision and remanded the case for proper evaluation of the opinions of Dr. Leonard M. Weinberger and Michele Cawley, CNP, and further consideration to Guttu's maximum residual functional capacity and appropriate rationale with specific references to the record in support of the limitations assessed.  (*Id.* at 287-88, 293.)

On May 4, 2018, the ALJ held a hearing, during which Guttu, represented by counsel, and an impartial VE testified.  (*Id.* at 293.)  At the hearing, Guttu amended his alleged onset date to April 1, 2013.  (*Id.*)  On September 5, 2018, the ALJ issued a written decision finding Guttu was not disabled.  (*Id.* at 293-315.)  The Appeals Council granted review of the ALJ's 2018 decision.  (*Id.* at 4.)  On October 22, 2019, the Appeals Council determined Guttu was not entitled to a POD, DIB, or SSI.  (*Id.* at 7.)  The Appeals Council decision is the final decision of the Commissioner.  (*Id.* at 1.)

On November 6, 2019, Guttu filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 15-16.) Guttu asserts the following assignments of error:

(1)  The ALJ's decision is not supported by substantial evidence because the ALJ violated the treating physician rule with respect to treating orthopedist James Rosneck, M.D.'s opinions.

(2)  The ALJ's RFC finding with respect to cane usage is not supported by substantial evidence.

(Doc. No. 13 at 17, 20.)

2

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Guttu was born in February 1976 and was 42 years-old at the time of his 2018 administrative hearing (*id.* at 293, 313), making him a "younger" person under Social Security regulations. 20 C.F.R. §§ 404.1563(c), 416.963(c). He has at least a high school education and is able to communicate in English. (Tr. 313.)   He has past relevant work as a material handler, building supply sales attendant, and department manager. (*Id.* at 312-13.)

### B.   Medical Evidence[2]

A lumbar spine x-ray taken in September 2014 showed minimal loss of height of T11 and slight disc space narrowing at L4 and L5. (Tr. 836.) Also noted were hypertrophic changes in the lower lumbar facet joints. (*Id.*) The impression was degenerative disc disease. (*Id.*) MRIs of Guttu's cervical and lumbar spine taken on March 10, 2015, were unremarkable. (*Id.* at 895-97.) A March 31, 2015 MRI of Guttu's brain was considered normal. (*Id.* at 893-94.)

An April 2015 EMG of Guttu's lower extremities revealed mild distal symmetric sensory motor peripheral polyneuropathy. (*Id.* at 905.) Leonard M. Weinberger, M.D., started Guttu on gabapentin. (*Id.*)

On May 6, 2015, Guttu saw Dr. Weinberger with complaints of bilateral hand and foot numbness that was burning or tingling in nature, decreased grip strength, dropping things, and spinal pain, primarily in the lumbar region. (*Id.* at 874.) Guttu admitted he had not yet started the gabapentin. (*Id.*) A physical examination revealed non-tender spine, 5/5 strength, mild decrease in pin, temperature, and vibration

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs. The medical evidence spanning dates August 7, 2018 through February 5, 2019, discussed on pages 14 and 15 of Guttu's brief (Doc. No. 13 at 14-15), was not exhibited by the Appeals Council and is not part of the record. (Tr. 4.) As a result, and since Guttu makes no Sentence Six argument, the Court does not discuss or consider this evidence.

sensation in the feet bilaterally at the toes and the fingertips. symmetric reflexes that were trace at the ankles, normal gait, stable stance, and negative Romberg testing.  (*Id.* at 875-76.)  Dr. Weinberger diagnosed Guttu with peripheral neuropathy associated with his diabetes.  (*Id.* at 876.)

That same day, Guttu saw Michelle Cawley, CNP, for follow-up regarding a recent glucose test.  (*Id.* at 879.)  Guttu told CNP Cawley he walked six miles three to four times a week for exercise, and he had lost 5 pounds.  (*Id.* at 879-880).  He reported lower back and leg pain that he rated as a 7/10.  (*Id.* at 880.)  On examination, CNP Cawley found Guttu's lower extremities weak bilaterally but a normal range of motion in all joints.  (*Id.*)  CNP Cawley's assessments consisted of: diabetes mellitus, type 1; coronary atherosclerosis of native vessel; hyperlipidemia; hypertension, not otherwise specified; and neuropathic pain.  (*Id.*)

On December 2, 2015, Guttu saw CNP Cawley for follow-up.  (*Id.* at 944.)  Gutto told CNP Cawley he walked three miles three to four times a week for exercise.  (*Id.*)  He had no new complaints and denied any medication side effects.  (*Id.*)  Guttu reported pain in his legs, feet, and back that he rated as a 7/10. (*Id.*)  CNP Cawley's examination revealed normal findings.  (*Id.* at 945.)  Guttu's diagnoses included type 1 diabetes mellitus; essential hypertension; hyperlipidemia; atherosclerotic heart disease of native coronary artery without angina pectoris; vitamin D deficiency; and neuralgia and neuritis.  (*Id.*)  Guttu was to continue care with Dr. Weinberger for his neuralgia and neuritis.  (*Id.*)

Abdominal X-rays taken on December 7, 2015, were normal.  (*Id.* at 956.)

On February 1, 2017, Guttu saw Dr. Weinberger for follow up of his neuropathy, which was "giving him some more trouble."  (*Id.* at 1013.)  Guttu complained of bilateral foot pain and numbness that was affecting his gait and causing him to feel some unsteadiness.  (*Id.*)  Guttu also told Dr. Weinberger his hands went numb intermittently.  (*Id.*)  On examination, Dr. Weinberger found decreased upper and lower extremity reflexes, decreased sensation, and abnormal gait with some unsteadiness and an

4

inability to tandem walk due to neuropathy. (*Id.* at 1015.) Dr. Weinberger diagnosed Guttu with peripheral neuropathy and carpal tunnel syndrome and ordered an updated EMG and a physical therapy evaluation. (*Id.* at 1016.)

On February 7, 2017, Guttu underwent a physical therapy evaluation for right sided lumbar pain and shooting pains in his bilateral upper and lower extremities. (*Id.* at 1022.) Guttu also complained of progressive neuropathy in his upper and lower extremities. (*Id.*) He was working full-time as an estimator for floor coverings. (*Id.*) On the patient questionnaire, Guttu reported his pain prevented him from sitting and standing more than ten minutes, he could not lift or carry anything at all, and he could not walk more than a half mile without increasing pain. (*Id.* at 1552.) On examination, Guttu's lumbar spine flexion was 30° with "[right] lumbar and diffuse [lower extremities] shooting pain with spinal flexion into end range." (*Id.* at 1023.) He exhibited lumbar segmental hypomobility. (*Id.*) Straight leg raises were to 40° bilaterally, a "[h]amstring stretch evoked glove like shooting leg pain," and Guttu's postural alignment was found to be thoracic kyphosis. (*Id.* at 1024.) Guttu's goals included improving his ability to carry light objects without back pain, and to improve strength and endurance to enable him to walk two miles without pain. (*Id.* at 1025.) Guttu was discharged after he failed to return for further treatment after his evaluation. (*Id.* at 1545.)

An EMG study of Guttu's lower extremities on February 14, 2017 revealed mild distal symmetric sensory motor peripheral polyneuropathy. (*Id.* at 1017-18.) Dr. Weinberger found the results similar to the previous study. (*Id.*)

On April 19, 2017, Guttu saw James Walker, M.D., for evaluation of left hip pain. (*Id.* at 1039.) Guttu reported the pain began two years ago and had been worse for the past three months. (*Id.*) Guttu told Dr. Walker it was hard to walk at times and he was unable to complete physical therapy because of his pain. (*Id.*) Guttu described the pain as a deep ache that radiated throughout his entire leg. (*Id.*)

5

Bending and walking aggravated the pain.  (*Id.*)  Dr. Walker noted Guttu was walking without aids.  (*Id.*)  On examination, Dr. Walker found significant pain, moderate stiffness, some weakness, stiffness with internal/external rotation of bilateral hips, and a positive straight leg test.  (*Id.*)  Dr. Walker believed "there is a component coming from his back" and that "he is pinching in the hip."  (*Id.* at 1040.)  Dr. Walker recommended a diagnostic fluoroscopic hip injection.  (*Id.*)

On April 25, 2017, Guttu underwent a left hip fluoroscopic injection.  (*Id.* at 1541.)

On August 16, 2017, Guttu saw Dr. Weinberger for follow up.  (*Id.* at 1045.)  Guttu reported continued neuropathy symptoms consisting of numbness, imbalance, incoordination, and pain.  (*Id.*)  His medications were helping, and he had no side effects.  (*Id.*)  Toujeo did not work so he was back to Lantus.  (*Id.*)  Guttu's carpal tunnel syndrome caused numbness and discomfort in his hands from time to time.  (*Id.*)  On examination, Dr. Weinberger found normal muscle bulk, tone, and strength in both upper and lower extremities.  (*Id.* at 1047.)  However, Guttu's sensory exam was abnormal, with "depressed distal pin, temp, vib."  (*Id.*)  Dr. Weinberger also found Guttu's coordination abnormal.  (*Id.*)  Guttu's gait was abnormal, with impaired tandem walking, and he demonstrated impaired fine finger movements as a result of his carpal tunnel syndrome.  (*Id.*)  However, Guttu exhibited a stable station, negative Romberg, and did not use a cane or walker.  (*Id.*)  Dr. Weinberger ordered Guttu to continue his current medication program.  (*Id.* at 1047.)

On October 25, 2017, Guttu saw Dr. Walker for follow-up of his left hip pain.  (*Id.* at 1037.)  Guttu complained of the same pain and stiffness and told Dr. Walker the injection provided "'very little relief.'"  (*Id.*)  Guttu reported significant pain, some stiffness and weakness, and occasional instability.  (*Id.*)  Guttu was full weight bearing with the use of a cane.  (*Id.*)  On examination, Dr. Walker found no swelling and that Guttu's range of motion remained the same.  (*Id.*)  Dr. Walker noted, "Patient's pain is not typical for

6

true ball and socket hip pain. It seems more soft tissue and that it is inflamed. I still recommend MRI arthrogram, patient was amenable." (*Id.*)

On October 31, 2017, Guttu underwent a left hip arthrogram on October 31, 2017. (*Id.* at 1030.) The impressions included: 1) "probable femoral acetabular impingement syndrome"; 2) "[h]ypertrophied left acetabulum with cystic change in acetabular roof"; 3) "[m]ild thinning of the hyaline cartilage acetabular cartilage"; 4) "[i]ncomplete chondral labral separation of the anterior labrum"; 5) "[i]rregular morphology of the anterior superior labrum suggesting probable tear in this region"; and 6) "[n]arrowing of the right hip joint with probable cam appearance to the right proximal femur also suggesting femoral acetabular impingement on the right." (*Id.* at 1031.)

On November 6, 2017, Guttu saw Dr. Walker for review of the MRI of his left hip. (*Id.* at 1027.) Guttu reported no change since his last visit. (*Id.*) Guttu complained of significant pain, some weakness, and some stiffness. (*Id.*) The MRI revealed impingement, labral tear, mild arthritis, and cystic changes in the acetabulum. (*Id.*) Dr. Walker diagnosed Guttu with left hip impingement syndrome, tear of left acetabular labrum, initial encounter, and primary osteoarthritis of the left hip. (*Id.*) Dr. Walker noted treatment options included fluoroscopic hip injection, which Guttu "had tried and failed" – or hip arthroscopy. (*Id.*) Dr. Walker opined Guttu's osteoarthritis was "very mild and total hip arthroplasty is not warranted radiographically." (*Id.*) Dr. Walker recommended Guttu try arthroscopy first and referred him to Dr. Rosneck. (*Id.*) Dr. Walker put Guttu on light duty until he could see Dr. Walker. (*Id.*)

On November 21, 2017, Guttu saw James Rosneck, M.D., regarding his left hip pain. (*Id.* at 1056.) Guttu told Dr. Rosneck the pain had lasted a year and described it as constant, moderate, and sharp. (*Id.*) Guttu denied any numbness, tingling, or electric shocks, but reported locking of his hip. (*Id.*) Activities of daily living, prolonged sitting and standing, recreational activities, and running aggravated the pain. (*Id.*) Guttu could not tell Dr. Rosneck any alleviating factors. (*Id.*) On examination, Dr.

Rosneck found a normal gait.  (*Id.*)  Guttu exhibited a positive single leg Trendeleburg, 90° hip flexion, 0° internal rotation, 30° external rotation, positive anterior impingement sign, positive dynamic labral stress test, positive FABER test, and positive posterior impingement test, all on the left.  (*Id.* at 1058.)  Dr. Rosneck diagnosed Guttu with left hip osteoarthritis and labral tear.  (*Id.*)  Dr. Rosneck told Guttu the odds of a hip arthroscopy helping him were 50/50.  (*Id.*)  Guttu wanted to proceed with a final treatment option and Dr. Rosneck told him to follow up with Dr. Walker.  (*Id.* at 1058-59.)

On December 6, 2017, Guttu saw Dr. Walker for follow up.  (*Id.* at 1033.)  Guttu told Dr. Walker he was doing poorly.  (*Id.*)  Guttu complained of moderate hip pain and stiffness and no relief from his last cortisone injection.  (*Id.*)  Guttu told Dr. Walker his left hip locked up so badly it prevented him from walking, and he could not do any stretching at all.  (*Id.*)  His other doctor recommended a total hip replacement.  (*Id.*)  Guttu complained he had been gaining weight due to being unable to work out or do physical therapy.  (*Id.*)  Dr. Walker noted Guttu was full weight-bearing but with use of a cane.  (*Id.*)  On examination, Dr. Walker found no swelling and that Guttu's range of motion remained the same.  (*Id.*)  Dr. Walker told Guttu his age was a factor for a total hip replacement.  (*Id.*)  Dr. Walker suggested another cortisone injection and physical therapy.  (*Id.*)  While Guttu's x-rays revealed moderate arthritis, there was still joint space left.  (*Id.*)  However, given how much Guttu's hip pain was affecting his life, Dr. Walker believed it was "not unreasonable to proceed with total hip arthroplasty."  (*Id.*)  A total hip replacement was scheduled for January 11, 2018.  (*Id.* at 1562.)

On January 2, 2018, Guttu was prescribed a walker to use after his left hip arthroscopy.  (*Id.* at 1052.)

On January 11, 2018, Guttu underwent orthopedic surgery for left hip arthroplasty, labral debridement, chondroplasty, femoroplasty, and removal of chondral loose body.  (*Id.* at 1574.)

On January 12, 2018, Guttu underwent a physical therapy evaluation at Sports Health, status post

left hip arthroscopy and with complaints of left hip pain.  (*Id.* at 1065.)  Jennifer Danzo, PT, felt Guttu's prognosis was good and developed a treatment plan.  (*Id.* at 1065-67.)  Guttu returned for physical therapy on January 17, 2018, January 23, 2018, January 25, 2018, January 31, 2018, February 7, 2018, February 14, 2018, February 28, 2018, and March 16, 2018.  (*Id.* at 1077-1123.)  On February 28, 2018, Guttu "exhibit[ed] continued high levels of pain and poor tolerance for Home Exercise Program as well as therapist-assisted Range of Motion activities."  (*Id.* at 1110.)  PT Danzo found Guttu continued to be limited in "most if not all functional activities."  (*Id.*)  Guttu's progress was slower than expected.  (*Id.*)  However, Guttu had "minimal gait deviations" and was only using a cane "when needed."  (*Id.*)

On January 30, 2018, Guttu saw Dr. Rosneck for his three-week post-operation follow-up.  (*Id.* at 1570.)  Guttu reporting he had been doing well since surgery and had been full weight bearing for three days.  (*Id.*)  Dr. Rosneck removed Guttu's sutures and there was no evidence of infection or deep vein thrombosis.  (*Id.*)  On examination, Guttu had 5/5 strength bilaterally.  (*Id.*)  Dr. Rosneck stated Guttu could continue full weight bearing as tolerated, but recommended Guttu consider a cane for longer distances.  (*Id.* at 1571.)

On February 20, 2018, Guttu saw Dr. Rosneck for his six-week post-operative follow-up.  (*Id.* at 1568.)  Guttu reported he had continued left groin pain, but the painful catching he was having prior to surgery had resolved.  (*Id.*)  Physical therapy was going well.  (*Id.*)  On examination, Dr. Rosneck found pain at 90 degrees during supine hip flexion and decreased FABER compared to the right with pain.  (*Id.*)

On March 7, 2018, Guttu saw Dr. Weinberger for follow-up of his peripheral neuropathy.  (*Id.* at 1042.)  Guttu reported increased neuropathy pain.  (*Id.*)  Guttu told Dr. Weinberger he had a bad left hip and had recently had an arthroscopic procedure, but the pain was worse than ever.  (*Id.*)  Guttu reported his insurance would not cover a hip replacement and he was getting around with a cane.  (*Id.*)  Guttu complained of pain and numbness in the bilateral lower extremities.  (*Id.*)  He had no medication side

effects.  (*Id.*)  While Guttu reported limb pain, numbness, and difficulty walking, he denied arthralgias, joint stiffness, muscle weakness, and back pain.  (*Id.* at 1042-43.)  On examination, Dr. Weinberger found normal muscle bulk, tone, and strength in both upper and lower extremities.  (*Id.* at 1044.)  However, Guttu's sensory exam was abnormal, with "depressed distal pin, temp, vib."  (*Id.*)  Dr. Weinberger also found Guttu's coordination abnormal.  (*Id.*)  Guttu's gait was abnormal, with impaired tandem walking, and he demonstrated impaired fine finger movements as a result of his carpal tunnel syndrome.  (*Id.*)  Guttu exhibited a stable station and negative Romberg.  (*Id.*)  He was using a cane.  (*Id.*)  Dr. Weinberger recommended Guttu increase his Gabapentin.  (*Id.*)

During Guttu's physical therapy session on March 16, 2018, Guttu "demonstrated difficulty with continued high levels of pain with minimal activities."  (*Id.* at 1118.)  Guttu reported right leg pain as well as back pain was limiting his activity.  (*Id.*)  At his March 21, 2018 physical therapy session, Guttu demonstrated difficulty with range of motion in all planes due to pain/pinching, though he did improve over the course of the session.  (*Id.* at 1578.)  Guttu walked with a cane and had an antalgic gait.  (*Id.*)  Jessica Adams, PTA, recommended Guttu speak to Dr. Rosneck about transitioning to aquatic therapy.  (*Id.*)

On April 4, 2018, Dr. Rosneck completed a Medical Source Statement regarding a hand-held assistive device.  (*Id.* at 1126.)  Dr. Rosneck opined the use of a single-prong cane was medically necessary for both walking and standing.  (*Id.*)  Dr. Rosneck further opined the need for a cane had been present since January 11, 2018.  (*Id.*)

That same day, Dr. Rosneck completed an Off-Task/Absenteeism Medical Source Statement.  (*Id.* at 1127.)  Dr. Rosneck opined Guttu would likely be off-task at least 20% of the time because of pain in his left hip, "continued disability due to left hip pain," osteoarthritis, medication, and needing a cane to ambulate.  (*Id.*)  Dr. Rosneck further opined these limitations had existed since April 10, 2016.  (*Id.*)

On April 13, 2018, Guttu saw Dr. Rosneck for his three-month post-operative follow-up.  (*Id.* at 1564.)  Guttu reported his mechanical symptoms had gone away, but he had gained weight and was using a cane for assistance when walking.  (*Id.*)  On examination, Guttu had a normal gait.  (*Id.*)  He had positive single leg Trendelenburg, hip flexion of 100˚, hip internal rotation of 10˚, and external rotation of 40˚, all on the left.  (*Id.*)  Guttu's FABER test was positive, but he had 5/5 strength in all but abduction, which was 4+/5, on the left.  (*Id.*)  Guttu also exhibited tenderness with palpation of the greater trochanter on the left.  (*Id.*)  Dr. Rosneck diagnosed Guttu with left hip osteoarthritis.  (*Id.* at 1565.)  Dr. Rosneck told Guttu to continue his medications and return in three months.  (*Id.*)  X-rays taken that same day showed postsurgical and degenerative changes of the left hip, with no acute osseous abnormality.  (*Id.* at 1566.)

On July 25, 2018, Dr. Walker reported Guttu was scheduled for left total hip replacement surgery on August 30, 2018.  (*Id.* at 1584.)

C.     **State Agency Reports**

On February 25, 2015, Leon Hughes, M.D., opined Guttu had the residual functional capacity ("RFC") to occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and/or walk for four hours in an eight-hour workday, sit for "about 6 hours" in an eight-hour workday, and limited ability to push and pull in both upper extremities.  (*Id.* at 242-43, 245.)  Guttu could frequently climb ramps/stairs, balance, stoop, kneel, crouch, and crawl.  (*Id.* at 243.)  He could occasionally climb ladders, ropes, and scaffolds.  (*Id.*)  Guttu had limited handling in both hands, but unlimited reaching in all directions, fingering, and feeling.  (*Id.* at 244.)  Guttu must avoid all exposure to hazards.  (*Id.* at 245.)

On May 27, 2015, Teresita Cruz, M.D., on reconsideration, opined Guttu had the residual functional capacity to occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and/or walk for four hours in an eight-hour workday, sit for "about 6 hours" in an eight-hour workday, and

11

limited ability to push and pull in both upper extremities.  (*Id.* at 259-61.)  Guttu could occasionally climb ramps and stairs, but could never climb ladders, ropes, and scaffolds.  (*Id.* at 260.)  He could frequently balance, stoop, kneel, crouch, and crawl.  (*Id.*)  Guttu had limited overhead reach bilaterally, limited handling and fingering, and unlimited feeling.  (*Id.* at 260-61.)  Guttu must avoid all exposure to hazards. (*Id.* at 261.)

### D.  Hearing Testimony

During the May 4, 2018 hearing, Guttu testified to the following:

- He lives in an in-law suite attached to his parents' house.  (*Id.* at 137.)  There are nine steps going into it, with railings on both sides.  (*Id.* at 137-38.)  He keeps a cane at the bottom of the stairs and one at the top.  (*Id.* at 138.)  His seven-year old son lives with him part-time.  (*Id.*)

- He does not do as much driving as he used to do.  (*Id.* at 139.)  He could take public transportation.  (*Id.* at 140.)

- He had difficulty writing because of his hands.  (*Id.* at 141.)  He drops things a lot and it is hard for him to hold a pen.  (*Id.*)  His writing does not look like it used to and it is getting sloppy.  (*Id.*)  Doing dishes is challenging because he drops silverware all the time.  (*Id.*)

- He uses his cane all the time, as he has balance issues now.  (*Id.*)  He uses a cane around the house.  (*Id.* at 161.)  He started using the cane on a regular basis in mid-2017.  (*Id.*)  He was unsure if his unsteadiness with his balance was orthopedic or related to his neuropathy.  (*Id.* at 162.)  He could walk ten or fifteen minutes with his cane, and maybe five or ten minutes without his cane.  (*Id.*)  He must lean on something when he is standing.  (*Id.* at 163.)  He always has to have his hand on something.  (*Id.*)  He could stand in place with his cane for maybe ten minutes.  (*Id.*)

- He has worked part-time since his alleged onset date.  (*Id.* at 142.)  He reads schematics to determine floor coverings for homes.  (*Id.*)  He is self-employed.  (*Id.*)  He finds work from people he has known in the business for a long time who know his character and that he is limited.  (*Id.*)  They are helping him out.  (*Id.*)

- He gets tingling and numbness in his feet, and sometimes feels like he has no feeling in his feet.  (*Id.* at 152.)  He is on gabapentin and it helps.  (*Id.*)  He does not want to take a higher dosage because he does not want it to affect his thinking.  (*Id.* at 152-53.)  Since upping the gabapentin it is better, but he still gets pain all the time.  (*Id.* at 153.)

- His neuropathy pain has gotten worse.  (*Id.*)  The pain in his left hip started at the beginning of 2017.  (*Id.* at 155.)  He also has back pain, but it is hard to distinguish from the pain in his hip.  (*Id.* at 155-56.)

- He has pain, numbness, and tingling in his hands.  (*Id.* at 156.)  He drops things and has lost strength in his hands.  (*Id.*)

- He has very little, if any, side effects from his medication and feels he gets a little bit of benefit from them.  (*Id.* at 157.)

- On a typical day, he gets up, does some stretches, goes down to the kitchen and makes his breakfast.  (*Id.* at 159.)  He has a cup of coffee and takes his medication, and then he uses his iPad or watches TV.  (*Id.*)  On the days he has his son he helps with his homework.  (*Id.*)  He would call his parents if his son needed help with a bath or shower, or there was something his son needed that he could not do, or if his sugar was high or low.  (*Id.* at 159-60.)  He can still do light chores around the house.  (*Id.* at 168.)  He can do the dishes, but his parents take the trash out.  (*Id.*)  His son empties the little garbage cans for him.  (*Id.*)  There is not much for him to clean.  (*Id.* at 169.)  His mother comes over and vacuums.  (*Id.*)

- He used to enjoy fishing, but he cannot do it anymore because he cannot hold the rod because of his hands.  (*Id.* at 160.)  He cannot cut his own hair anymore, but he can still shave although it bothers him to hold the razor for that length of time.  (*Id.* at 164-65.)  He has problems reaching overhead.  (*Id.* at 165.)

- Bending bothers his back.  (*Id.* at 166.)  He cannot touch his toes.  (*Id.*)

- He could not do a strict desk job because he must be up and down so much.  (*Id.* at 167-68.)  He cannot sit in one spot all day.  (*Id.* at 168.)  It would require him "to be off-task quite a bit to be sitting like that all day."  (*Id.*)

- His hip surgery did not work.  (*Id.* at 169-70.)  It worked for his hip locking up, but it did not work for the other part.  (*Id.* at 170.)  He is unsure what will happen now but thought his insurance might cover a hip replacement now.  (*Id.*)

The VE testified Guttu had past work as a material handler, building supply sales attendant, and department manager.  (*Id.* at 175.)  The ALJ then posed the following hypothetical question:

> For the first hypothetical would you please consider an individual with the same age, education, and past work as Mr. Guttu?  This person can perform a range of light exertional work subject to the following. He can lift and/or carry twenty pounds occasionally and ten pounds frequently. He can sit for six hours per eight-hour workday as well as stand and/or walk for four hours per eight-hour workday. He  can  occasionally  climb ramps and stairs and occasionally balance, stoop, kneel, crouch, and crawl. He cannot climb ladders, ropes, or scaffolds. This person can

> perform no more than frequent operation of hand controls, no more than frequent pushing and pulling with the bilateral upper extremities. And no more than frequent handling, fingering, and feeling bilaterally. This person can operate foot controls frequently. He can tolerate no greater than occasional exposure to slippery, uneven or vibrating surfaces. He must avoid hazards such as unprotected heights and moving mechanical machinery. He cannot perform commercial driving. He cannot perform overhead reaching but can perform frequent reaching in other directions. Could this person perform Mr. Guttu's past work?

(*Id.* at 175-76.)

The VE testified the hypothetical individual would not be able to perform Guttu's past work as a material handler, building supply sales attendant, and department manager.  (*Id.* at 176.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as office helper, warehouse checker, and office mail clerk.  (*Id.* at 176-77.)

The ALJ then posed a second hypothetical:

> Thank you, ma'am, if you took this same person but now reduced his ability such that he can lift and/or carry only ten pounds occasionally and less than ten frequently, he can still sit for six hours in an eight-hour workday but now stand and/or walk for only two hours in an eight-hour workday. Everything else remains the same. Would there be any work in the regional or national economy for this person?

(*Id.* at 177.)

The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as bench assembler, charge account clerk, and electronics assembler.  (*Id.*)

The ALJ then asked the VE whether adding to either hypothetical the individual requires the ability to use a cane for ambulation would change her testimony.  (*Id.*)  The VE testified it would not.  (*Id.* at 177-78.)  The ALJ then asked the VE what if, for either hypothetical, the individual required a cane for standing and ambulation.  (*Id.* at 178.)  The VE testified such a limitation would prevent her from identifying competitive employment.  (*Id.*)

The ALJ also asked the VE the threshold at which an individual's absenteeism and off-task behavior becomes work preclusive.  (*Id.*)  The VE testified as follows:

> Yes, Your Honor, it's my vocational opinion that an individual in unskilled, entry level work may use the time they approve. The most generous leave package that I have been exposed to is roughly four hours per pay period. And if we assume there are roughly two pay periods per month, we're looking at eight hours. That would be the max for absenteeism that you could use repetitively. Now being off task, these jobs again at unskilled, SVP 1 and 2 permit two breaks, morning and afternoon and they total twenty to thirty minutes out of the eight-hour workday. If you're going to need additional time, it is my testimony it cannot exceed 5%.

(*Id.*)

## III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4)*, *416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant

15

must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).    Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

Here, Guttu was insured on his alleged disability onset date, April 1, 2013, and remains insured through December 31, 2021, his date last insured ("DLI").  (Tr. 6, 293-94.)  Therefore, in order to be entitled to POD and DIB, Guttu must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The Appeals Council made the following findings of fact and conclusions of law:

1.  The claimant met the special earnings requirements of the Act on April 1, 2013, the date the claimant stated he became unable to work and continues to meet them through December 31, 2021.

    The claimant has not engaged in substantial gainful activity since April 1, 2013.

2.  The claimant has the following severe impairments: bilateral carpal tunnel syndrome; degenerative disc disease; history of Scheurmann's disease; diabetes mellitus with peripheral neuropathy; obesity; history of coronary artery disease status post angioplasty; arteriosclerotic heart disease; cervicalgia; history of left hip labral tear; femoral acetabular impingement; degenerative joint disease, status post arthroscopy; and thoracis spondylosis, but does not have an impairment or combination of impairments which is listed in, or which is medically equal to an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.

3.  The claimant's combination of impairments results in the following limitations on his ability to perform work-related activities: sedentary work subject to the following additional limitations: (1) no more than occasional climbing ramps and stairs; (2) no more than occasional balancing, stooping, kneeling, crouching, and crawling; (3) no climbing of ladders, ropes, or scaffolds; (4) no more than frequent operation of hand controls; (5) no more than frequent pushing or pulling with the bilateral upper extremities; (6) no more than frequent handling, fingering, and feeling; (7) no more than frequent operation of foot controls; (8) no more than occasional exposure to slippery, uneven, or vibrating surfaces; (9) no work around hazards such as unprotected heights or moving mechanical machinery; (10) no commercial driving; (11) no reaching overhead; (12) no more than frequent reaching in other directions; and (13) must use a cane for ambulation.  In view of the above limitations, the claimant has the residual functional capacity to perform a reduced range of the sedentary exertional level.

4.  The claimant's alleged symptoms are not consistent with and supported by the evidence of record for the reasons identified in the body of this decision.

5.  The claimant is unable to perform past relevant work as a material handler, a building supply sales attendant, or a department manager because his residual functional capacity would preclude the performance of these jobs.

6.  The claimant was 42 years old as of the date of decision, which is defined as a younger individual aged 18-44, and has a high school education.  The claimant's past relevant work is semiskilled or skilled.  The issue of transferability of work skills is not material in view of the claimant's age and residual functional capacity.

7.  If the claimant had the capacity to perform the full range of the sedentary exertional level, 20 CFR 404.1569 and 416.969 and Rule 201.28, Table No. 1 of 20 CFR Part 404, Subpart P, Appendix 2, would direct a conclusion of not disabled.  Although the claimant's exertional and nonexertional impairments do not allow him to perform the full range of the sedentary exertional level, using the

above-cited Rule as a framework for decisionmaking, there are a significant number of jobs in the national economy which he could perform. An individual with the claimant's medical-vocational profile would be able to perform the requirements of representative occupations such as the following: 1) bench assembler (Dictionary of Occupational Titles (DOT) 713.687-026), sedentary, unskilled work (SVP-2), with 100,000 jobs in the national economy; 2) charge account clerk (DOT 205.367-014), sedentary, unskilled work (SVP-2), with 80,000 jobs in the national economy; and 3) electronics assembler (DOT 723.687-010), sedentary, unskilled work (SVP-2), with 50,000 jobs in the national economy.

8. The claimant is not disabled as defined in the Social Security Act at any time through September 5, 2018, the date of the Administrative Law Judge's decision.

(Tr. 6-7.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different

conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

# VI. ANALYSIS

Because the Appeals Council granted Guttu's request for review of his claims and then issued a decision, that decision is the final decision of the Commissioner in this case.  *See* 20 C.F.R. §§ 404.981, 416.1481 ("The Appeals Council decision. . . is binding unless you or another party file an action in Federal district court, or the decision is revised.").  Review of the Appeals Council decision, however, reveals that the Appeals Council adopted many of the ALJ's conclusions, including those relevant to the analysis of medical evidence:

> The Appeals Council adopts the Administrative Law Judge's statements regarding the pertinent provisions of the Social Security Act, Social Security Administration Regulations, Social Security Rulings and Acquiescence Rulings, the issues in the case, and the evidentiary facts, as applicable.
>
> The Appeals Council adopts the Administrative Law Judge's findings or conclusions regarding whether the claimant is disabled.
>
> . . . The Appeals Council agrees with the Administrative Law Judge's findings under steps 1, 2, 3, 4 and 5 of the sequential evaluation; namely, that the claimant has not engaged in substantial gainful activity since April 1, 2013, that the claimant has severe impairments which do not meet or equal in severity an impairment in the Listing of Impairments, that he is not capable of performing past relevant work, and there is not [sic] a significant number of jobs the claimant is capable of performing.

(Tr. 5.)  Where the Appeals Council relies on or adopts the findings of an ALJ, "the substantial evidence standard of review applies to the findings regardless of whether they were made by the Appeals Council, the ALJ, or were made by the Appeals Council in reliance on the ALJ's findings."  *Taylor v. Comm'r of Soc. Sec.*, 91 F.3d 144 (Table), 1996 WL 400175, at *4, n.2 (6th Cir. 1996).   Accordingly, this Court reviews the conclusions of the ALJ to the extent that the Appeals Council affirmed them.  *Cunningham v. Colvin*, 2014 U.S. Dist. LEXIS 174469, at *23 (N.D. Ohio Dec. 17, 2014).

### A.    Dr. Rosneck's Opinions

Guttu asserts the ALJ violated the treating source rule in two ways: 1) he failed to consider and weigh Dr. Roscneck's opinion regarding off-task behavior, which was harmful error as the degree of off-task behavior to which Dr. Rosneck opined was work preclusive according to the VE's testimony; and 2) the ALJ failed to give "good reasons" for assigning less weight to Dr. Rosneck's opinion regarding Guttu's use of a hand-held assistive device.  (Doc. No. 13 at 19.)

The Commissioner admits the ALJ failed to consider and weigh Dr. Rosneck's opinion regarding off-task behavior.  (Doc. No. 15 at 10.)  However, the Commissioner argues any error was harmless, as the ALJ considered two other opinions in the record regarding off-task behavior.  (*Id.*)  Regarding Dr. Rosneck's opinion regarding cane usage, the Commissioner argues the ALJ reasonably evaluated the opinion.  (*Id.* at 6.)

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c), and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight."  *Id.*  "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), *id.* § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id.* § 404.1502, 404.1527(c)(2)."  *Id.*   In other words, "'the regulations provide progressively more rigorous tests for weighing opinions as the ties between the

source of the opinion and the individual become weaker.'"  *Gayheart*, 710 F.3d at 375 (quoting SSR No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996)).[3]

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2).  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009).  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly

---

[3] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 F. Reg. 5844 (March 27, 2017). SSR 96-6p has been rescinded and replaced by SSR 17-2p, effective March 27, 2017. *See* Soc. Sec. Rul. No. 17-2p, 2017 WL 3928306 at *1 (Soc. Sec. Admin. Mar. 27, 2017).

where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. Moreover, the "treating physician rule" only applies to medical opinions. "If the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors— [the ALJ] decision need only 'explain the consideration given to the treating source's opinion.'" *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 505 (6th Cir. 2013). The opinion, however, "is not entitled to any particular weight." *Turner*, 381 F. App'x at 493. *See also Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 471 (6th Cir. 2014).

### 1. Dr. Rosneck's opinion regarding cane usage

Guttu argues the ALJ failed to give good reasons for the weight assigned to Dr. Rosneck's opinion regarding his use of a cane because the ALJ "cherry-picked the medical evidence of record" in discounting his opinion, in addition to inaccurately stating Guttu required only "conservative medical

treatment" despite the fact he had undergone a left hip arthroplasty with labral debridement, chondroplasty, femorplasty, and removal of loose chondral body.[4]  (Doc. No. 13 at 19-20.)

The ALJ weighed and considered Dr. Rosneck's opinion regarding Guttu's cane usage as follows:

> On April 4, 2018, treating orthopedic specialist James Rosneck, M.D., opined that an assistive device, namely a single prong cane, has been medically necessary since January 11, 2018 to aid in both walking and standing (Exhibit 39F). Dr. Rosneck noted continued disability due to left hip pain and osteoarthritis (Id.). Although Dr. Rosneck is a treating source, with specialty in the relevant field of orthopaedics, his opinion does not warrant controlling or great weight. Although I have incorporated use of a cane into the foregoing residual functional capacity, it is noteworthy that many examinations have revealed a normal gait and station, without use of an assistive device, and the evidence of mild to moderate abnormalities on diagnostic imaging of the hip, in conjunction with the claimant's young age, only mild obesity, and the recommended course of conservative medical treatment, strongly weigh against the need for a cane (Exhibit 3lF, 32F, 34F, 37F, 38F, 44F, 46F). In addition, a finding of disability is an issue reserved to the Commissioner of Social Security (20 CPR 404.1527(d) and 416.927(d)). For these reasons, I give Dr. Rosneck's opinion less weight.

(Tr. 311-12.)

Guttu's argument regarding the inaccuracy about his course of treatment is well-taken, albeit he omits discussion of the Appeals Council's consideration of the evidence that he was scheduled for a total left hip replacement.  The Appeals Council determined the ALJ improperly excluded certain evidence, including a note that Guttu was scheduled for a total left hip replacement, and exhibited the evidence.  (Id. at 5.)  While the Appeals Council found this note, as well as some physical therapy treatment notes, "do show some ongoing symptomatology," the Appeals Council determined these records "do not show any significant changes in symptoms or diagnoses from the other medical evidence of record."  (Id.)  The

---

[4] Guttu also relies on evidence of his total hip replacement and an additional surgery due to an infection in support of his argument.  (Doc. No. 13 at 20.)  However, as discussed at n.2, *supra*, this evidence was not exhibited by the Appeals Council and Guttu has made no Sentence Six argument.  Therefore, the Court does not consider this evidence.

Appeals Council determined "these records do not change the findings and conclusions of the Administrative Law Judge." (*Id.*)

The Court agrees with Guttu that his left hip arthroplasty with labral debridement, chondroplasty, femorplasty, and removal of loose chondral body, as well as being scheduled for a total left hip replacement at his young age, does not constitute "conservative treatment." However, other good reasons for the weight assigned to Dr. Rosneck's opinion – namely, other records showing a normal gait and station without the use of an assistive device, as well as Guttu's young age and mild obesity – remain.

Guttu accuses the ALJ of cherry-picking the evidence regarding his gait and use of an assistive device, arguing the ALJ relied on evidence that predated the onset date of January 11, 2018 opined by Dr. Rosneck and the later exhibits cited by the ALJ did not support his conclusion as they contained "consistently abnormal findings on exam as well as the need to ambulate with either a walker or a cane . . . ." (Doc. No. 13 at 20.) But review of the later exhibits relied on by both the ALJ and Guttu reveal mixed evidence regarding his gait and cane usage after January 11, 2018. For example, on January 31, 2018, PT Danzo noted Guttu was full-weight bearing with an independent gait, no gait device, and had "demonstrated improvements in gait and activity tolerance," although he had a left lower extremity gait deviation. (Tr. 1093.) On February 14, 2018, Guttu was using a cane because he felt more stable. (*Id.* at 1104.) But on February 28, 2018, PT Danzo wrote, "Normal gait when permitted per protocol Achieved – Pt with minimal gait deviations, states using cane 'when needed.'" (*Id.* at 1110.) On March 7, 2018, Dr. Weinberger found Guttu had an abnormal gait and was using a cane but had a stable station. (*Id.* at 1044.) On April 13, 2018, Dr. Rosneck noted Guttu used a "cane for ambulation assistance" but had a normal gait. (*Id.* at 1564.)

Earlier in the opinion, the ALJ determined the evidence was mixed and out of "an abundance of caution," incorporated use of a cane for walking (but not standing) into the RFC. (*Id.* at 308.) The ALJ

25

then found Dr. Rosneck's opinion inconsistent with "many examinations [that] have revealed a normal gait and station, without use of an assistive device," and cited exhibits in support. (*Id.* at 312.)  It is not for this Court to reweigh the evidence.

Although the Court finds the ALJ's reason of "conservative medical treatment" was not a good one, the ALJ provided other good reasons for the weight assigned to Dr. Rosneck's opinion.  There is no error in the ALJ's assignment of less weight to Dr. Rosneck's opinion regarding Guttu's cane usage.

### 2. Dr. Rosneck's opinion regarding off-task behavior

On April 4, 2018, Dr. Rosneck opined Guttu would likely be off-task at least 20% of the time because of pain in his left hip, "continued disability due to left hip pain," osteoarthritis, medication, and needing a cane to ambulate. (*Id.* at 1127.)  Dr. Rosneck further opined these limitations had existed since April 10, 2016. (*Id.*)

As mentioned above, the Commissioner concedes the ALJ failed to discuss Dr. Rosneck's opinion regarding off-task behavior, but maintains this failure is harmless error because of the ALJ's treatment of two other opinions regarding Guttu's off-task behavior in the record – one by Dr. Weinberger, a treating source, and one by CNP Cawley, who does not qualify as a treating source under the regulations. (Doc. No. 15 at 10-14.)

The Sixth Circuit has identified the failure to mention and consider an opinion of a treating source as grounds for reversal and remand under the treating source rule. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407-08 (6th Cir. 2009).  "Therefore, absent a finding of harmless error, this Court must remand." *Richards v. Comm'r of Soc. Sec.*, No. 1:13 CV 1652, 2014 WL 4421571, at *9 (N.D. Ohio Sept. 8, 2014). *See also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747-50 (6th Cir. 2007).

The Sixth Circuit has identified the following circumstances where a violation of the treating source rule constitutes harmless error: 1) where a treating source opinion "is so patently deficient that the

26

Commissioner could not possibly credit it"; 2) where "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or 3) "where the Commissioner has met the goal of § 1527(d)(2)—the provision of the procedural safeguard of reasons—even though [he] has not complied with the terms of the regulation." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004). "'An ALJ may accomplish the goals of this procedural requirement by *indirectly* attacking the supportability of the treating physician's opinion or its consistency with other evidence in the record.'" *Richards*, 2014 WL 4421571, at *9 (quoting *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 440 (6th Cir. 2010) (citing *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470-72) (6th Cir. 2006)) (emphasis in original).

After review of the ALJ's decision and the record, the Court finds the ALJ indirectly attacked Dr. Rosneck's off-task opinion through his treatment of the record, the additional opinion evidence of record, and Guttu's credibility. *Richards*, 2014 WL 4421571, at *10. "Therefore, the goals of the treating physician rule have been satisfied." *Id.* (citations omitted).

The ALJ identified Dr. Rosneck as a treating source and an orthopedic specialist in weighing and considering his opinion regarding Guttu's cane usage. It appears the ALJ conflated Dr. Rosneck's two opinions in his analysis. The ALJ stated, "Dr. Rosneck noted continued disability due to left hip pain and osteoarthritis." (Tr. 311.) Furthermore, one reason the ALJ gave Dr. Rosneck's cane usage opinion less weight was "a finding of disability is an issue reserved to the Commissioner of Social Security . . . ." (*Id.* at 312.) But Dr. Rosneck only opined as to Guttu being disabled in his off-task opinion, not his opinion regarding cane usage. (*Id.* at 1126-27.)

The ALJ indirectly attacked Dr. Rosneck's off-task opinion through his treatment of the off-task opinions of Dr. Weinberger and CNP Cawley. The ALJ weighed these two opinions as follows:

> On March 16, 2016, treating neurologist Leonard M. Weinberger, M.D., opined the claimant can walk 1 city block without rest or severe pain, sit 30 minutes at a time, stand 10 minutes at a time, stand/walk about 2 hours total, and sit about 4 hours total (Exhibit 18F). He indicated the claimant

needs to walk every 20 minutes for 10 minutes each time, and needs a job that permits shifting positions at will from sitting, standing, or walking *(Id.)*. Dr. Weinberger concluded the claimant requires unscheduled breaks, a few times per week, lasting 20 minutes each *(Id.)*. He opined the claimant can rarely lift/carry less than 10 pounds, and never lift/carry 10 pounds *(Id.)*. Dr. Weinberger indicated the claimant can never twist, bend, or crouch/squat, and can perform limited reaching, handling, and fingering, as he can grasp, turn, and twist objects, perform fine manipulation, and reach in front of body and overhead only 5% with either upper extremity *(Id.)*. He concluded the claimant experiences pain that is frequently severe enough to interfere with the attention and concentration needed to perform even simple work tasks *(Id.)*. Dr. Weinberger noted the claimant is likely to have good and bad days, and will be absent from work about 4 days per month *(Id.)*. In another medical source statement rendered that day, Dr. Weinberger opined the claimant would be off task at least 20% of the time, and absent from work more than 4 times a month (Exhibit 19F). On March 12, 2018, Dr. Weinberger affirmed these restrictions (Exhibit 35F).

Although Dr. Weinberger has a lengthy treating relationship with the claimant, and specialty in the relevant field of neurology, his opinions do not warrant controlling or even great weight, for several reasons. First, the opinions are inconsistent with Dr. Weinberger's own treatment notes, which contain examination findings of decreased sensation and abnormal coordination and gait, but normal motor functioning, full strength throughout, stable station, and negative Romberg testing (Exhibit SF, l0F, 20F, 28F, 29F, 34F). Furhtermore [sic], the opinions are inconsistent with the objective record as a whole, including the findings of only mild abnormalities on EMG testing of the upper and lower extremities, and conservative scope of treatment, consisting of use of non-narcotic medications and participation in physical therapy (Exhibit SF, l0F, 20F, 28F, 29F, 34F, 44F). Finally, the opinions are inconsistent with the claimant's own reported activities, which have admittedly included walking more than one block without reported pain *(See* Exhibit 6F/5; 5F/2; 14F/5; Hearing Testimony). For these reasons, Dr. Weinberger's opinions warrant less weight.

Treating primary care provider Michelle Cawley, CNP, opined on April 20, 2016 that the claimant experiences pain often severe enough to interfere with attention and concentration, and that he will be off task at least 20% of the time and absent from work about twice a month (Exhibit 23F, 24F). These opinions warrant less weight, for several reasons. First, the opinions are inconsistent with the objective record as a whole, including the mild to moderate musculoskeletal and mild neurological abnormalities on diagnostic testing of the lumbar spine, cervical spine, and upper and lower extremities, the generally moderate abnormalities on examination, and the generally conservative scope of medical treatment,

> including occasional injections, use of non-narcotic pain medication, and participation in physical therapy, with some improvement, all of which contradicts a finding of significant absenteeism or off task behavior (Exhibit 2F, 3F, 4F, 5F, 6F, 7F, SF, 9F, l0F, 11F, 12F, 13F, 14F, 20F, 21F, 22F, 25F, 26F, 27F, 28F, 29F, 30F, 3lF, 32F, 33F, 34F, 36F, 37F, 38F, 40F, 43F, 44F, 46F). Furthermore, the opinions are inconsistent with the claimant's reported activities, which include watching television, using a computer, doing yard work and household chores, working part-time, caring for his son, cooking, driving a car and boat, using public transportation, washing dishes, and walking several miles for exercise (Exhibit 6F/7, 5; 5F/2; 14F/5; Hearing Testimony). Finally, it is also noteworthy that Ms. Cawley is not an acceptable medical source as defined by the Social Security Administration regulations (20 CFR 404.1527 and 416.927). For these reasons, her opinions warrant less weight.

(*Id.* at 310-11.)

While the inconsistency with treatment records is specific to Dr. Weinberger, the other reasons given by the ALJ for not crediting the off-task opinions, including the mild to moderate diagnostic findings, some improvement, and Guttu's activities of daily living, apply equally to Dr. Rosneck's off-task opinion.[5]

The ALJ also indirectly attacked Dr. Rosneck's off-task opinion through his discussion of the medical records.  After a thorough analysis of the medical evidence, the ALJ found as follows:

> In assessing the claimant's allegations, I have also considered the scope of treatment. The record indicates a history of coronary artery disease, status post angioplasty and stenting, as well as persistent ASHD treated with medication (Exhibit 13F, 21F, 26F, 40F, 43F, 44F). However, the claimant is stable from a cardiovascular standpoint, despite relatively limited follow up with his cardiologist (Exhibit 13F, 21F, 26F, 44F). Despite the claimant's allegations of totally debilitating pain, diagnostic imaging has revealed generally mild to moderate degenerative and neurological findings, and examinations have revealed largely mild to moderate abnormalities, inconsistent with the claimant's reported symptoms (Exhibit 2F, 3F, 4F, 5F, 6F, 7F, SF, 9F, l0F, 11F, 12F, 13F, 14F,20F,21F,22F,25F,26F,27F,28F,29F,30F,31F,32F,33F,34F,36F,37F, 38F, 40F, 43F, 44F, 46F). The claimant's diabetes has generally been uncontrolled, resulting in consistently high hemoglobin Al C levels and

---

[5] The Court notes Guttu does not challenge the weight assignments for Dr. Weinberger's or CNP Cawley's opinions.

> persistent neuropathy with decreased sensation on examination (Exhibit 6F, SF, 9F, l0F, 1lF, 20F, 27F, 28F, 29F, 34F). However, the claimant has been often noncompliant with diabetic treatment *(Id. See also* Exhibit 1lF/4). Recent treatment notes indicate resolution of mechanical symptoms with left hip arthroscopy, and following surgery, the claimant was able to transition from use of a walker to single-prong cane with participation in conservative post-operative treatment, including physical therapy (Exhibit 34F, 38F, 46F). In addition, despite the claimant's extensive medical history and numerous severe physical impairments, he has not required frequent emergency treatment or hospitalization *(See* Exhibit 44F). This evidence suggests that the claimant's impairments, while severe, are manageable with relatively conservative medical care.

(*Id.* at 309.)

The ALJ's treatment of Guttu's subjective symptoms also indirectly attacks the supportability and consistency with the record of Dr. Rosneck's off-task opinion.  As part of his subjective symptom evaluation, the ALJ found as follows:

> The claimant's activities of daily living detract from his allegations of totally debilitating impairment and instead support the foregoing residual functional capacity. The claimant lives with his parents, can no longer hold a fishing rod, requires assistance with hair cutting, does not take out the garbage, and occasionally requires assistance with cooking and bathing his son (Hearing Testimony). However, the claimant is able to drive, use public transportation, use a computer, watch television, help his son with homework, shave, and do the dishes *(Id.).* The medical record suggests more extensive activities since the amended alleged onset date than reported by the claimant. For example [sic] in June 2013, the claimant reported doing yard work and housework during the day, and working at Lowe's in the evenings (Exhibit 6F/7). Throughout 2014 and 2015, the claimant reported walking several miles, three to four days a week, for exercise (Exhibit 6F/5; 5F/2; 14F/5). In addition, as noted above, the claimant has consistently engaged in part-time work activity since the amended alleged onset date, which has included employment at Lowe's, work at a driving school, and self-employment (Exhibit 4D, l0D, 14D, 18D, 20D, 3E, 9E). These activities, while perhaps somewhat restricted, confirm he is not as physically limited as he has alleged.

(*Id.* at 308-09.)  The Court notes Guttu does not challenge the ALJ's subjective symptom analysis.

For these reasons, and following careful review of the ALJ's decision, the undersigned recommends the Court find the ALJ's omission of Dr. Rosneck's off-task opinion constitutes harmless

error.  The Court notes "that this is a rare case of the ALJ's analysis meeting the goal of the rule even if not meeting its letter."  *Nelson*, 195 F. App'x at 472.

### B.  Cane Usage

Guttu argues the ALJ's RFC finding lacks the support of substantial evidence "because it is unclear why the ALJ found he needs a cane for walking but not standing."  (Doc. No. 13 at 21.)  The Commissioner argues that the record does not support the need for a cane while standing; rather, the medical evidence from late 2017 and 2018 show he only needed a cane while walking.  (Doc. No. 15 at 9) (citations omitted).  Guttu responds that the record does contain evidence of his need to use a cane while standing – Dr. Rosneck's opinion.  (Doc. No. 16 at 5.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a)(1).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§§ 404.1527(d)(3), 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. §§ 404.1546(c), 416.946(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96-

31

8p at *7, 1996 WL 374184 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered.  *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. Appx. 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

As set forth in the discussion of the relevant medical evidence and the portion of this Report & Recommendation regarding Dr. Rosneck's opinion about Guttu's cane usage, the evidence regarding Guttu's use of a cane is mixed. The ALJ discussed this evidence in detail, acknowledged it was mixed, and incorporated a cane for walking into the RFC "in an abundance of caution." (Tr. 308.) *See Forrester v. Comm'r of Soc. Sec.*, No. 2:16-cv-1156, 2017 WL 4769006, at *3 (S.D. Ohio Oct. 23, 2017) ("Unlike many cases involving the use of a cane, the ALJ did not overlook evidence concerning Plaintiff's need for the cane or fail to address this issue.") (collecting cases). Where evidence is mixed regarding the use of a cane, it is the ALJ's duty, not the Court's, to resolve the conflicts. *Id.* at *4. The ALJ did so here.

Guttu does not accuse the ALJ of cherry-picking the record here; he asserts the ALJ failed to explain why he did not need a cane for standing. (Doc. No. 13 at 20-21; Doc. No. 16 at 5.) But the ALJ explained why he assigned less weight to Dr. Rosneck's opinion that Guttu needed a cane for standing. And Guttu does not point to any line of evidence the ALJ overlooked or ignored with respect to his need for a cane while standing. (Doc. Nos. 13, 16.) In fact, the only evidence Guttu cites in support of his need for a cane to stand is Dr. Rosneck's opinion itself. (Doc. No. 16 at 5.) While perhaps the ALJ could have been clearer in stating his finding that Guttu did not need a cane for standing, his conclusion and his reasoning are sufficiently clear from his decision. A perfect opinion is not required. *Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.") (citations omitted); *see also NLRB v. Wyman–Gordon Co.,* 394 U.S. 759, 766 n.6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (when "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.").

Substantial evidence supports the ALJ's RFC finding that Guttu required a cane to walk but not to stand. Therefore, the undersigned recommends the Court AFFIRM the ALJ's RFC finding.

33

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED

Date: July 2, 2020                                   *s/ Jonathan Greenberg*
                                                    Jonathan D. Greenberg
                                                    United States Magistrate Judge


### **OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**